1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LINDA HALL,

                Plaintiff,

    v.

CATHOLIC HEALTH INITIATIVES,
ST. ANTHONY HOSPITAL,

                Defendant.

CASE NO. C19-5360 BHS

ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

13

14

15

16

This matter comes before the Court on Defendant Catholic Health Initiatives, St.

Anthony Hospital's motion for summary judgment. Dkt. 27. The Court has considered

the pleadings filed in support of and in opposition to the motion and the remainder of the

file and hereby grants the motion for the reasons stated herein.

17

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

18

19

Hall has worked as an RN in the Emergency Department of St. Anthony since

2009. Dkt. 1-1, ¶¶ 3.3–3.5. She has insulin-dependent diabetes. *Id.*, ¶ 3.7. She mentioned

20

21

22

that she was diabetic in her interview and signed a form during the hiring process stating that she could perform the job without accommodation. Dkt. 28-1 at 66, 98.[1]

Hall works three twelve-hour shifts per week and is entitled to two thirty-minute meal breaks and three fifteen-minute breaks per shift in accordance with St. Anthony's policy. Dkt. 1-1, ¶¶, 3.6, 3.14; Dkt. 27-2 at 21. Hall primarily monitors her blood sugar at work through a continuous monitor paired with her cell phone. Dkt. 27-2. at 61. When her blood sugar is too low, her heart races, she runs out of energy, she feels shaky and cannot think clearly, and she sometimes feels sweaty. *Id*. at 62. To counteract this, she needs to eat. *Id*. When her blood sugar is too high, she feels lethargic and needs insulin, exercise, or hydration to counteract it. *Id*. at 62–63. Hall testified that she is able to go to the bathroom without taking a break, and sometimes she will need to run and take a bathroom break to use the bathroom and inject insulin at the same time. *Id.* at 18.

Hall testified that staff at St. Anthony regularly miss breaks due to understaffing. Dkt. 28-1 at 63. In 2011, Hall advocated for better break access for nursing staff, which was noted positively in her performance evaluation. Dkt. 27-2 at 7.

St. Anthony Clinical Manager for the Emergency Department Sheila Niven declared that nurses in the Department may be responsible for up to four patient rooms at a time. Dkt. 27-6, ¶ 5. She declared that for a nurse to take a break, their patients "must be covered by another nurse or a charge nurse so that necessary supervision and care can be provided during the break." *Id*. A charge nurse is a "semi-managerial position

---

[1] The Court cites the CM/ECF page numbering.

1  responsible for coordinating the work flow, activities, assignments, and the patient care

2  provided in the Emergency Department on a given shift." *Id*., ⁋ 7.

3      On May 19, 2016, Hall gave her manager a letter from her doctor notifying St.

4  Anthony that she had insulin-dependent diabetes and requesting accommodations. Dkt. 1-

5  1, ⁋⁋ 3.11, 3.13. The letter stated that Hall "is a brittle diabetic [who] will need to take

6  regular scheduled breaks in order to test her blood sugar level." Dkt. 27-2 at 34. Hall first

7  met with her supervisors to discuss her request on June 28, 2016. Dkt. 1-1, ⁋ 3.13. Hall

8  was told that the charge nurse would relieve Hall for the meal breaks, but Hall would

9  need to use the "buddy break" system for her fifteen-minute breaks—to find another staff

10  RN to cover her patients during her break. Dkt. 27-2 at 10.

11      Hall alleges that over the next eleven months, charge nurses regularly refused to

12  cover her meal breaks and staff nurses refused to cover her fifteen-minute breaks. Dkt. 1-

13  1, ⁋ 15. She testified that when she asked for her breaks "it became uncomfortable and

14  hostile." Dkt. 27-2 at 13. On May 1, 2017, Hall and her manager, Christi Powers, met

15  with St. Anthony's Human Resources Director Vicki Lackman to review these issues.

16  Dkt. 1-1., ⁋ 3.17; Dkt. 27-5, ⁋ 6. They agreed that Hall's breaks would occur at set times,

17  charge nurses would be required to cover Hall's meal breaks, and if Hall could not

18  identify a "buddy" for her fifteen-minute breaks, a charge nurse would cover her. Dkt. 1-

19  1, ⁋ 3.19. Powers instructed the charge nurses to prioritize Hall's rest breaks if she could

20  not identify a buddy. *Id*., ⁋ 3.20; Dkt. 27-5 at 15.

21      Over the next several weeks, Hall alleges that she "continued to be met with

22  hostility when she approached nurses to ask for cooperation for a 'buddy break,'

1    including nurses accusing her of already having taken a break, or simply walking away

2    without acknowledging that [Hall] had requested their assistance," and alleges that the

3    charge nurses were similarly hostile. Dkt. 1-1, ¶¶ 3.21–.22. Hall began to record her

4    missed breaks and requested another meeting with the HR manager and her manager. *Id.*,

5    ¶ 3.23. At that meeting on June 13, 2017, Hall reported her issues with buddy breaks but

6    acknowledged she had not requested assistance from charge nurses when she encountered

7    difficulty, and Powers and Stacy Georgette reminded her that she should do so. *Id.*,

8    ¶ 3.25; Dkt. 27-3, ¶ 5. Georgette, a St. Anthony HR Manager during the relevant period,

9    asked whether Hall would prefer to work in another part of the hospital that would

10   provide more regular breaks, but Hall declined. Dkt. 27-3, ¶ 6.

11       Nurses in the Emergency Department were sometimes assigned to triage. *Id.*,

12   ¶ 3.28. When Hall was assigned to triage, she was able to access snacks to control her

13   blood sugar without using the buddy break system, was able to avoid the need for preset

14   breaks, and did not experience hostility because she did not need to ask others to cover

15   her. *Id.*, ¶¶ 3.29, 3.30; Dkt. 27-2 at 12.

16       Hall testified that in September 2017, she returned from a meeting with HR and

17   found Emergency Department staff laughing at a sign that said "No Break for You,"

18   posted "in the nurses' station by the charge nurse, between the charge nurse and the

19   HUC." Dkt. 27-2 at 15. She testified that the sign was created by Jason Strader, another

20   ED staff member, and she believed Strader knew she had diabetes but did not know for

21   sure. *Id.* Georgette declared that Hall did not report the sign to HR despite multiple

22   meetings with HR about her accommodations during 2017. Dkt. 27-3, ¶ 7.

Hall testified that she recalled going to the bathroom and being told that was her break. Dkt. 27-2 at 13. She also testified that on one occasion when she reported a missed break, Powers called and yelled at her, asking "[w]hy didn't you get your break?" Dkt. 28-1 at 81, and that a charge nurse, likely Powers, told her "breaks don't just happen," Dkt. 27-2 at 15. Another nurse also emailed a supervisor stating that Hall had logged missed breaks in May 2017 without having asked for a buddy break. Dkt. 28-1 at 77. Hall also testified that on a few occasions she was accused of taking a meal break when she only took a fifteen-minute break but did not recall who had made those accusations. *Id*. at 84. Hall testified that at some point she started taking screenshots on her phone to show the time for every break. *Id*. at 64–65. She also testified that, during a period when Tricia Castellano was the charge nurse, she felt like things were "spiraling," that she had trouble getting assistance with heavy-care patients, and that some charge nurse had assigned her a heavier patient load than other nurses. *Id*. at 90. On one occasion, Hall overhead one person at the nurses' station quietly tell another to be quiet in front of Hall because "there's spies among us." Dkt. 27-2 at 22.

Janie Patterson, who worked at St. Anthony as a staff nurse and interim charge nurse, declared that Powers and Castellano confronted her at least three times on the issue of whether Hall had taken longer breaks than she should or reported her breaks incorrectly. Dkt. 28-1 at 48.[2] She declared that Powers and Castellano would look

---

[2] St. Anthony objects that Hall did not disclose the scope of Patterson's declaration until the day before discovery closed and objects that much of her testimony is not based on personal knowledge. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . .

1    through the break book and "question [her] over and over about [Hall's] breaks." *Id.* She

2    declared that she was not aware of other nurses having their breaks scrutinized. *Id*. The

3    record does not demonstrate that Hall was aware of these incidents.

4         On October 18, 2017, Hall requested full-time assignment to triage as a reasonable

5    accommodation. Dkt. 1-1, ⁋ 3.34. Management denied the request but offered to allow

6    her to store snacks in the triage office area. *Id*., ⁋ 3.35. Management also agreed that a

7    charge nurse would relieve Hall for all breaks when she was not in triage. Dkt. 27-3 at 13.

8    Though she was told she should still use buddy breaks for her fifteen-minute breaks while

9    stationed at triage, *id.*, Hall alleges that when she was assigned to triage, she was "able to

10    access snacks to control her blood sugar regularly without having to ask other nurses for

11    coverage under the buddy break system and was able to successfully take the breaks she

12    needed . . . ." Dkt. 1-1, ⁋ 3.29.

13         Georgette declared that triage was one of several assignments in the Emergency

14    Department, which were never permanent assignments. Dkt. 27-3, ⁋10. She declared that

15    St. Anthony would not want to assign one nurse permanently to triage because it would

16    impede opportunities for other nurses to maintain their triage skills and maintaining these

17    skills is important for patient safety. *Id.*, ⁋ 11.

18         Hall also requested training as a relief charge nurse (a staff nurse who serves as

19    charge nurse on an as-needed basis) and was scheduled to begin training in the fall of

20    2017. Dkt 1-1, ⁋ 3.36; Dkt. 27-6, ⁋ 7. Georgette declared that St. Anthony's Chief

21

22    unless the failure was substantially justified or is harmless." As admitting this exhibit does not
     harm St. Anthony, the objection is overruled.

1   Nursing Officer Mary Ragsdale informed her that a physician and two charge nurses had

2   expressed concern to Ragsdale that Hall was not suitable for the role. Dkt. 27-3, ¶ 8.

3   Ragsdale declared that the concerns "related in part to [Hall's] lack of propensity and

4   initiative in her staff nurse position, and whether she would be able to manage additional

5   responsibilities in a charge role." Dkt. 27-7, ¶ 5. Ragsdale declared that she was "not

6   aware of any prior situation in which such concerns have been raised about an individual

7   scheduled for relief charge nurse training." *Id*. Ragsdale asked Georgette to investigate,

8   and Georgette "learned of similar concerns held by other individuals in the Emergency

9   Department." Dkt. 27-3, ¶ 8. Ragsdale declared that based on this situation, she realized

10  St. Anthony lacked standards to determine when a nurse would be eligible for the

11  responsibility of relief charge nurse training or criteria to determine competence and

12  paused all relief charge nurse training hospital-wide to put these standards in place. Dkt.

13  27-7, ¶ 7.

14         On November 22, 2017, Ragsdale and Georgette told Hall her training would be

15  postponed but could be revisited later. Dkt. 27-3, ¶ 9. Georgette explained to Hall that she

16  had received concerns that Hall was improperly reporting missed breaks and using

17  internet and her phone excessively but found these unsupported. *Id*. at 10. Georgette also

18  told Hall that it was of course acceptable that Hall checked her blood sugar readings on

19  her phone. *Id*. Georgette explained that she had received concerns about Hall's initiative

20  and abrasive communication related to her eligibility for training for relief charge nurse.

21  *Id*. Georgette specified areas to improve initiative such as starting vitals proactively,

22  asking if physicians needed assistance, and requesting feedback on the spot. *Id*. at 10–11.

1    Georgette also explained that St. Anthony was revising its criteria for eligibility for the

2    training and would share it when updated in approximately March 2018. *Id*. at 11.

3        Subsequently, Hall argues that she continued to miss breaks, was denied

4    assignment to triage, and was struggling with her colleagues' and managers' increasingly

5    hostile behavior. Dkt. 28 at 5. Hall also sought therapy and treatment for her emotional

6    distress. *Id*. (citing Dkt. 28-1 at 52).[3]

7        Niven declared that between April 3, 2018 and April 3, 2019, Hall reported a total

8    of 26 missed rest breaks and 8 missed lunch breaks. Dkt. 27-6, ¶ 10. Niven declared that

9    based on Hall's normal yearly schedule, she would have approximately 720 breaks over a

10   twelve-month period. *Id*., ¶ 11. St. Anthony accurately characterizes this as over 90% and

11   close to 95% of her scheduled breaks, noting that some variation would be possible due

12   to Hall's picking up additional shifts or taking vacation. Dkt. 27 at 13 & n.2.

13       On April 3, 2019, Hall sued St. Anthony alleging it subjected her to discrimination

14   and retaliation in violation of the Washington Law Against Discrimination, RCW

15   Chapter 49.60, discrimination, retaliation, it failed to accommodate her disability in

16   violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., and

17   negligent hiring and supervision. Dkt. 1-1. On December 23, 2020, St. Anthony moved

18

19           [3] St. Anthony objects that the declaration of Tammy Noffsinger, Hall's psychotherapist,
     is inadmissible triple hearsay. Dkt. 30 at 5. However, Hall's briefing only relies on this
20   declaration for the fact that Hall sought therapy and treatment for her emotional distress, Dkt. 28
     at 6, evidence which could be presented in an admissible form at trial. *See Fonseca v. Sysco*
21   *Food Serv's of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) (internal quotation and citation
     omitted).

22

for summary judgment. Dkt. 28. On January 11, 2021, Hall responded. Dkt. 29. On January 13, 2021, Hall filed a supplement to her response, informing the Court that she was withdrawing her claim for negligent hiring and supervision. Dkt. 29. On January 15, 2021, St. Anthony replied. Dkt. 30.[4]

## II.   DISCUSSION

St. Anthony moves for summary judgment on all of Hall's remaining claims. St. Anthony argues that it engaged in the interactive process in good faith when it repeatedly improved its efforts to ensure Hall could take her breaks and did not retaliate against her when it postponed her training after receiving unprecedented concerns from staff. St. Anthony also contends that the harassment Hall identifies was not sufficiently severe or pervasive to constitute a hostile work environment.

### A.   Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

---

[4] St. Anthony also filed motions, separate from the objections indicated in its reply, to exclude the Patterson's and Nofsinger's declarations, but later withdrew the motions, Dkt. 33.

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.    Failure to Accommodate**

"Judicial interpretations of the ADA and the WLAD differ slightly in the way they phrase the elements of an accommodation claim under the two statutes, but the basic requirements are essentially the same." *McDaniels v. Group Health Co-op.*, 57 F. Supp. 3d 1300, 1314 (W.D. Wash. 2014). "Both statutes require the plaintiff to show that (1)

1    she is disabled; (2) she is qualified for the job in question and capable of performing it

2    with reasonable accommodation; (3) that the employer had notice of her disability; and

3    (4) the employer failed to reasonably accommodate her disability." *Id*. (citing *Samper v.*

4    *Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012); *Zivkovic v. S.*

5    *Cal. Edison Co.*, 302 F.3d 1080, 1088–89 (9th Cir. 2002); *Davis v. Microsoft Corp.*, 149

6    Wn.2d 521 (2003)).

7        "Once an employer becomes aware of the need for accommodation, that employer

8    has a mandatory obligation under the ADA to engage in an interactive process with the

9    employee to identify and implement appropriate reasonable accommodations."

10    *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (citing *Barnett v.*

11    *U.S. Air*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *vacated on other grounds sub*

12    *nom.*, *US Airways, Inc. v. Barnett*, 535 U.S. 391, 406 (2002)). "'An appropriate

13    reasonable accommodation must be effective, in enabling the employee to perform the

14    duties of the position.'" *Id*. (citing *Barnett*, 228 F.3d at 1115). "This interactive process

15    'requires: (1) direct communication between the employer and the employee to explore in

16    good faith the possible accommodations; (2) consideration of an employee's request; and

17    (3) offering an accommodation that is reasonable and effective.'" *U.S. E.E.O.C. v. UPS*

18    *Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010) (quoting *Zivkovic*, 302 F.3d at

19    1089). "'An employer is not obligated provide an employee the accommodation he

20    requests or prefers, the employer need only provide some reasonable accommodation.'"

21    *Id*. (quoting *Zivkovic*, 302 F.3d at 1089).

22

1    "[T]he ADA says that 'discrimination' includes an employer's '*not making*

2    *reasonable accommodations* to the known physical or mental limitations of an otherwise

3    qualified employee . . . *unless* [the employer] can demonstrate that the accommodation

4    would impose an *undue hardship* on the operation of [its] business.'" *US Airways*, 535

5    U.S. at 396 (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations and emphasis in original).

6    "[A]n employer's obligation to engage in the interactive process extends beyond the first

7    attempt at an accommodation and continues when the employee asks for a different

8    accommodation or where the employer is aware that the initial accommodation is failing

9    and further accommodation is needed." *Humphreys*, 239 F.3d at 1138. However, if an

10   accommodation is reasonable, the employer has satisfied its legal obligation, "and the

11   inquiry is over." *Sharpe v. Am. Tel. & Tel. Co.*, 66 F.3d 1045, 1050 (9th Cir. 1995).

12   "Determining whether a proposed accommodation is reasonable and whether it may

13   impose an undue hardship on the employer 'requires a fact-specific, individualized

14   inquiry.'" *Roness v. T-Mobile USA, Inc.*, Case No. C18-1030-RSM, 2019 WL 2918234,

15   at *4 (W.D. Wash. Jul. 8, 2019) (quoting *Nunes v. Wal-Mart Stores, Inc*., 164 F.3d 1243,

16   1247 (9th Cir. 1999)).

17      Hall argues there is a dispute of material fact as to whether St. Anthony engaged in

18   the interactive process in good faith. Dkt. 28 at 8. St. Anthony argues that it engaged in

19   the interactive process in good faith, the accommodation it offered was effective, and the

20   only alternative accommodation Hall requested was unreasonable. Dkt. 30 at 6.

21      Hall argues that St. Anthony did not engage in the interactive process in good faith

22   because "she was told that she would be using buddy breaks, something that she did not

1  want to do and did not agree with because of the strain it put on other nurses. No

2  alternatives were discussed. Her opinion was not a concern." Dkt. 28 at 8. St. Anthony

3  counters that it repeatedly refined its accommodation to meet Hall's needs and its

4  accommodation allowed her to do her job and manage her health needs. Hall's evidence

5  does not establish that St. Anthony's accommodations for her breaks, which evolved

6  multiple times to provide additional support, did not allow her to perform the duties of

7  her position or caused her to experience limiting symptoms of her diabetes. *See*

8  *Humphrey*, 239 F.3d at 1137; *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 777–

9  78 (2001) ("A reasonable accommodation must allow the employee to work in the

10 environment and perform the essential functions of her job without substantially limiting

11 symptoms."). The employer is not obligated to select the employee's preferred

12 accommodation. *U.S. E.E.O.C*, 620 F.3d at 1110; *see also Frisino*, 160 Wn. App. at 779

13 ("Where multiple potential modes of accommodation exist, the employer is entitled to

14 select the mode; the employee is not.").

15      St. Anthony first accommodated Hall by providing that a charge nurse would

16 cover her two meal breaks and that she would use buddy breaks for her fifteen-minute

17 breaks. Next, it provided that charge nurses would cover Hall's fifteen-minute breaks if a

18 buddy break was unavailable. Then, it offered that she could consider another hospital

19 department where breaks were more readily available. Finally, as of Hall's October 18,

20 2017 meeting with HR, St. Anthony had agreed that a charge nurse would relieve Hall for

21 all breaks when she was not in triage, and while stationed at triage she would still need to

22

1   use buddy breaks for her fifteen-minute breaks but would also be able to store needed

2   items in the cabinet area. Dkt. 27-3 at 13. As noted, Hall's complaint alleges that

3   when she was assigned to triage, she was "able to access snacks to control her blood

4   sugar regularly without having to ask other nurses for coverage under the buddy break

5   system and was able to successfully take the breaks she needed . . . ." Dkt. 1-1, ¶ 3.29.

6        Therefore, by the end of the interactive process, Hall's exposure to buddy breaks

7   was substantially or entirely curtailed, she was able to take breaks on a regularly set

8   schedule, and she was able to take over 90 percent of her scheduled breaks. Hall's

9   physician stated only that she needed regularly scheduled breaks to check her blood

10  sugar. The evidence in the record shows that St. Anthony's accommodations reasonably

11  evolved in response to Hall's concerns.

12       The Court concludes Hall has not met her burden to show specific, significant

13  probative evidence to create a genuine dispute of material fact as to the reasonableness or

14  good faith of St. Anthony's accommodation at the end of the interactive process. *See*

15  *Matsushita*, 475 U.S. at 586. While Hall argues that following her initial advocacy about

16  missed breaks in 2011, she continued to miss breaks to the point that she became

17  concerned about her ability to care for her diabetes, Dkt. 28 at 2–3, there is no evidence

18  in the record that the final parameters of the accommodation were either medically

19  insufficient for Hall, impacted her job performance, or even exposed her on a regular

20  basis to the need to request buddy breaks from other staff nurses. No reasonable juror

21  could find an absence of good faith from St. Anthony's efforts to accommodate Hall.

22

1    Even if this was not the case, the only other accommodation Hall proposed was a

2    full-time assignment to triage. Hall argues that St. Anthony has not shown assigning her

3    to triage would have caused an undue hardship. Dkt. 28 at 9 (citing *U.S. Airways*, 535

4    U.S. at 402). However, a reasonable accommodation does not require an employer to

5    eliminate essential functions of the position. *Dark v. Curry Cnty.*, 451 F.3d 1078, 1089

6    (9th Cir. 2006); *Davis*, 149 Wn.2d at 534–35. St. Anthony has put forward

7    uncontroverted evidence that the essential functions of an RN in the Emergency

8    Department extend well beyond triage. *See Cripe v. City of San Jose*, 261 F.3d 877, 885

9    (9th Cir. 2001) ("the question of 'undue hardship' arises only when an accommodation is

10   necessary to enable a disabled person to perform a job's *essential* functions and the

11   proposed accommodation is 'reasonable.'") (footnote omitted). For example, Emergency

12   Department Clinical Manager Sheila Niven declared her belief that "it is essential for

13   nurses in the Emergency Department to provide a full range of emergency care on the

14   unit's main floor." Dkt. 27-6, ¶ 6. The written job description lists "Additional Essential

15   Job Functions" including triage as only one of a multitude of special emergency care

16   procedures. Dkt. 27-5 at 11. And St. Anthony has never assigned anyone permanently to

17   triage. Dkt. 27-3, ¶¶ 10–11.

18          The Court concludes that Hall's alternative accommodation is not reasonable as it

19   seeks to exempt her from the essential functions of her job. *See Samper v. Providence St.*

20   *Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012). Hall has not provided any viable

21   alternative to the unavailable position of permanent triage nurse. Therefore, St.

22

1    Anthony's motion for summary judgment on Hall's failure to accommodate claims is

2    GRANTED, and the claims are dismissed with prejudice.

3    **C.    Retaliation**

4          "[A] plaintiff who lacks direct evidence of retaliation must first make out a prima

5    facie case of retaliation . . . ." *Emeldi v. Univ. of Ore.*, 673 F.3d 1218, 1223 (9th Cir.

6    2012) (quoting *Brown v. City of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003)). "Once a

7    plaintiff has made the threshold prima facie showing, the defendant must articulate a

8    legitimate, non-retaliatory reason for the challenged action." *Id.* at 1224 (citing *Davis v.*

9    *Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)). "If the defendant does so, the

10   plaintiff must then 'show that the reason is pretextual either directly by persuading the

11   court that a discriminatory reason more likely motivated the employer or indirectly by

12   showing that the employer's proffered explanation is unworthy of credence.'" *Id.*

13   (quoting *Davis*, 520 F.3d at 1089). "Circumstantial evidence of pretext must be specific

14   and substantial in order to survive summary judgment." *Bergene v. Salt River Project*

15   *Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001).

16         To establish a prima facie claim of retaliation, a plaintiff must prove that (1) the

17   plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment

18   action, and (3) there was a causal link between the plaintiff's protected activity and the

19   adverse employment action. *Villiarimo v. Aloha Is. Air, Inc.*, 281 F.3d 1054, 1064 (9th

20   Cir. 2002). An adverse employment action is defined broadly, as "any action 'reasonably

21   likely to deter employees from engaging in protected activity.'" *Ray v. Henderson*, 217

22   F.3d 1234, 1243 (9th Cir. 2000).

1    Hall argues that she experienced adverse employment actions in the form of being

2    denied regular breaks, being subject to an investigation that resulted in her being removed

3    from the relief charge nurse rotation, and being subject to retaliatory harassment. St.

4    Anthony counters that the issues with breaks do not constitute adverse employment

5    actions and that, even if Hall can establish a prima facie case of retaliation related to the

6    relief charge nurse training, she cannot establish pretext.

7    The Court has concluded that by the end of the interactive process, St. Anthony's

8    accommodation of Hall's need for breaks was reasonable. Therefore, the denial of regular

9    breaks as Hall experienced them is not consistent with an action likely to deter a

10   reasonable employee from engaging in protected activity. *See Ray*, 217 F.3d at 1243

11   (actions the Ninth Circuit has found to be adverse employment actions include lateral

12   transfers, unfavorable references, and the imposition of a more burdensome work

13   schedule). The record shows that missing breaks in the Emergency Department was not

14   confined to Hall. She testified that other staff regularly missed breaks and that it was her

15   belief that this was due to understaffing. Dkt. 27-2 at 7. The Court concludes that a

16   reasonable jury could not find the amount of missed breaks Hall identifies at the end of

17   the interactive process constitute an adverse employment action. Hall does not provide

18   any comparator or raise a factual dispute as to Ragsdale's honest belief in the stated basis

19   for her decision.

20   Similarly, the Court concludes that the investigation of her breaks Hall identifies

21   (which was not raised in her complaint) does not rise to the level of an adverse

22   employment action. Hall does not cite any evidence that management conveyed anything

1    about this investigation to her or relied on it to negatively impact her work. Therefore, a

2    reasonable jury could not conclude that this type of informal investigation was reasonably

3    likely to deter protected activity. *Compare Campbell v. Haw. Dep't of Educ.*, 892 F.3d

4    1005, 1013 (9th Cir. 2018) ("mere fact that employer received and investigated

5    allegations of misconduct against [Plaintiff]—with no resulting change to the conditions

6    of her employment" is not adverse employment action) *with Poland v. Chertoff*, 494 F.3d

7    1174, 1180 (9th Cir. 2007) (formal administrative inquiry with witness testimony was

8    adverse employment action) *and Ulrich v. City and Cnty. of San Francisco*, 308 F.3d

9    968, 972, 977 (9th Cir. 2002) (formal investigation which could have resulted in

10   revocation of clinical privileges and filing of adverse action report was adverse

11   employment action).

12        St. Anthony argues that even if Hall could establish a prima facie case of

13   retaliation, the concerns it received from multiple charge nurses and physicians in the

14   Emergency Department about Hall's suitability for the charge nurse position meet its

15   burden to provide a legitimate, nondiscriminatory reason for removing Hall from the

16   relief charge nurse rotation. Dkt. 27 at 24. The Court agrees. *Emeldi*, 673 F.3d at 1224.

17   Therefore, the burden shifts to Hall to show the decision was pretextual. *Id.*

18        Hall argues that all of the criticisms she faced leading to her removal from the

19   rotation were related to her requests for accommodation and her disability. Dkt. 28 at 13.

20   Specifically, she argues that she was accused of looking at her phone too much,

21   misrepresenting her breaks, lacking initiative, and being abrasive because she insisted on

22   attending to her medical needs and taking the breaks she needed. *Id.*

1    These arguments do not support the inference that Georgette and Ragsdale were

2    more likely motivated by retaliation rather than the unprecedented concerns expressed to

3    them or were motivated by a retaliatory purpose to pause and reevaluate eligibility for

4    training on a hospital-wide basis. *Emeldi*, 673 F.3d at 1223. Moreover, Georgette

5    determined and communicated to Hall that concerns about phone use and break logging

6    were unfounded. Dkt. 27-3 at 10–11. The evidence in the record is that the concerns

7    Georgette identified as substantiated were not related to Hall's breaks but were specific to

8    working with physicians, communicating with patients, and her communication style

9    with colleagues. *Id*. The Court concludes that Hall fails to put forward the sort of specific

10   and substantial circumstantial evidence of pretext related to the training required to

11   survive summary judgment. *Bergene*, 272 F.3d at 1142. Moreover, to the extent Hall

12   asserts that she was subject to harassment in retaliation for her self-advocacy, "[c]old or

13   hostile behavior in itself is insufficient to constitute an adverse action for the purposes of

14   a retaliation claim." *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1068–69 (citing

15   *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 803 (9th Cir. 2003)). Therefore, St.

16   Anthony's motion for summary judgment on Hall's retaliation claims is GRANTED, and

17   those claims are dismissed with prejudice.

18   **D.    Hostile Work Environment**

19   Under Washington law, a plaintiff alleging disability-based hostile work

20   environment must demonstrate that (1) they were disabled within the meaning of the

21   antidiscrimination statute, (2) the harassment was unwelcome, (3) it was because of

22   disability, (4) it affected the terms and conditions of employment, and (5) it was

1    imputable to the employer. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 45 (2002). In

2    construing this claim, Washington courts look to federal cases construing the analogous

3    federal statute, Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1). *Id.* (citing

4    *Fahn v. Cowlitz Cnty.*, 93 Wn.2d 368, 376 (1980)). Title VII prohibits harassment so

5    severe and pervasive as to alter the conditions of employment and create a hostile work

6    environment. *Id.* (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). The

7    "environment must be both objectively and subjectively offensive, one that a reasonable

8    person would find hostile or abusive, and one that the victim in fact did perceive to be

9    so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift*

10   *Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). Courts consider the totality of the circumstances,

11   including "the frequency of the discriminatory conduct; its severity; whether it is

12   physically threatening or humiliating, or a mere offensive utterance; and whether it

13   unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 21.

14   The parties do not dispute that the standards of Title VII cases such as *Harris* and

15   *Faragher* are appropriately applied to an ADA hostile workplace claim.

16        Importantly, a plaintiff "may state a case for harassment against the employer

17   under one of two theories: vicarious liability or negligence." *Swinton v. Potomac Corp.*,

18   270 F.3d 794, 803 (9th Cir. 2001). If the harasser is a supervisor, then the employer may

19   be vicariously liable, but if the harasser is a co-worker, the plaintiff must prove the

20   employer "knew or should have known of the harassment but did not take adequate steps

21   to address it." *Id.* (citing *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 875 (9th Cir.

22   2001)).

1       The Court concludes that Hall does not establish St. Anthony knew of harassment

2   by coworkers that it failed to take adequate steps to address. Hall argues that she was

3   subject to "nasty comments, day after day." Dkt. 28 at 13. She testified that "it became

4   uncomfortable and hostile" when she asked colleagues to cover her breaks and that an

5   unspecified person or persons accused her of taking her break when she went to the

6   bathroom briefly. Dkt. 28-1 at 79, 81. Georgette's meeting notes from June 13, 2017

7   reflect that Hall reported her colleagues were hostile in that they did not help her take a

8   break, accused her of already having had a break, and sometimes walked away. Dkt. 27-3

9   at 7.  The "spies among us" comment, which occurred at an unspecified time, could also

10  be reasonably interpreted as related to Hall's reporting to HR about her colleagues'

11  reluctance to help her take breaks. Dkt. 27-2 at 15. However, the record does not

12  establish that Hall continued to report harassment by co-workers after October 2017, at

13  which point her accommodation had evolved so that her exposure to "buddy breaks" was

14  almost entirely curtailed. Therefore, no reasonable juror could conclude that St. Anthony

15  failed to take adequate steps to address the coworker harassment it was aware of, so it

16  may not be held vicariously liable. *Swinton*, 270 F.3d at 803.

17      Harassment by supervisors is a closer question. There is no evidence that the

18  harassment Hall alleges was "physically threatening or humiliating" as opposed to a

19  "mere offensive utterance." *Harris*, 510 U.S. at 23. There is also no evidence that the

20  harassment unreasonably interfered with her work performance. *Id*. Hall testified that she

21  has received good reviews every year. Dkt. 27-2 at 16.

22

1    Therefore, the Court is left to consider whether the harassment Hall experienced

2    from supervisors was either severe or pervasive in the totality of the circumstances.

3    *Harris*, 510 U.S. at 21. Hall testified that on one occasion Powers (a charge nurse) yelled

4    at her, asking "why didn't you get your break?," and that on another occasion, someone,

5    possibly Powers, told her rudely that breaks "don't just happen." Dkt. 28-1 at 79, 81, 83,

6    89. Hall also testified that she believed that charge nurses gave her a heavier workload or

7    more challenging patients on some occasions and that she would ask for help and not

8    receive it. Dkt. 27-2 at 15.

9    The "No Break for You" sign appeared while Hall was at a meeting with HR

10    regarding her breaks and was located "in the nurses' station by the charge nurse, between

11    the charge nurse and the HUC." Dkt. 27-2 at 15. While the timing is some circumstantial

12    evidence that it was related to her request for accommodation, there is no evidence that a

13    charge nurse posted the sign or that it was left up for a sufficient duration that a charge

14    nurse would have been aware of it.

15    Hall submits the declaration of her psychotherapist to establish that she suffered

16    from emotional distress so substantial that she needed therapy and treatment. Dkt. 28 at 6

17    (citing Dkt. 28-1 at 52–55). Hall's psychotherapist's declaration also notes that Hall

18    repeatedly stated that she experienced bullying at work, including a specific incident Hall

19    described in the spring of 2018 where she told a charge nurse she needed a break to eat

20    because her blood sugar was extremely low, but the charge nurse said "Here, just eat

21    some candy" and laughed in front of Hall's coworkers, making Hall feel "absolutely

22    humiliated and degraded." Dkt. 28-1 at 54.

1      St. Anthony objects that the psychotherapist's selective curation of her case notes

2    is triple hearsay, but Hall could ostensibly testify at trial to interactions she experienced,

3    including to statements by coworkers to show the effect on Hall rather than the truth of

4    the matter asserted. *Fonseca*, 374 F.3d at 846. However, it would be prejudicial to St.

5    Anthony for the Court to draw conclusions from apparent facts Hall did not brief. "It is

6    the parties' responsibility to cite to the materials in the record they wish the Court to

7    consider." *Graham-Sult v. Clainos*, No. C 10-4877 CW, 2016 WL 324347, at *2 (N.D.

8    Cal. 2016) (citing *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir.

9    1988) ("The district court is not required to comb the record to find some reason to deny

10   a motion for summary judgment.")).

11     Hall has shown that she found the environment subjectively hostile. However, the

12   Court concludes that even if it were to also consider the candy-throwing incident, these

13   instances taken together do not meet the high bar for severity or pervasiveness on a

14   hostile work environment claim. The Court finds *Mangaliman v. Washington State DOT*,

15   No. CV11–1591 RSM, 2014 WL 1255342 (W.D. Wash. Mar. 26, 2014) instructive. In

16   *Mangaliman*, the plaintiff alleged he was called a "dumb Filipino" by supervisors on

17   several occasions, identifying one specific instance (that his supervisor disputed). *Id.* at

18   *10. The plaintiff also alleged that supervisors scrutinized his conduct, subjected him to

19   extensive performance testing, and created an environment where "any reasonable person

20   can fail." *Id.* While it discounted the plaintiff's testing claims as lacking evidence of

21   prejudice, the Court reasoned that "[e]ven if the comments that Plaintiff contends he

22   heard were uttered with some frequency, they were not sufficiently severe or physically

threatening to render his employment environment hostile, and Plaintiff has not made any

showing that these comments hindered his work performance." *Id*. The Court reasoned

that the Ninth Circuit has rejected hostile work environment claims with "far more

serious conduct," *id.*, citing *Vasquez v. County of Los Angeles*, 349 F.3d 634, 643 (9th

Cir. 2003).

In *Vasquez*, the Circuit concluded no reasonable jury could find a hostile work

environment despite two racially offensive comments, two instances of yelling in front of

others, and two instances of criticism to supervisors. 349 F.3d at 642–43. The Ninth

Circuit reasoned that the allegations in that case were at least as severe as those *Sanchez

v. City of Santa Ana*, 936 F.3d 1027 (9th Cir. 1990), where the Circuit concluded no

reasonable jury could have found a hostile work environment despite "allegations that the

employer posted a racially offensive cartoon, made racially offensive slurs, targeted

Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide

adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs

because they were Latino." *Id.*

Taking Hall's allegations in the light most favorable to her, the Court finds they

are more serious than the conduct alleged in *Mangaliman* but less serious that the conduct

alleged, but still found insufficient, in *Vasquez* and *Sanchez*. *See also Caldwell v. Boeing

Co.*, 2019 WL 1556246, at *15 (W.D. Wash. Apr. 10, 2019) (collecting cases concluding

multiple incidents of racially offensive comments insufficient for hostile work

environment claim). Therefore, St. Anthony's motion for summary judgment on Hall's

hostile work environment claims is GRANTED, and those claims are dismissed with prejudice.

### III.   ORDER

Therefore, it is hereby **ORDERED** that St. Anthony's motion for summary judgment, Dkt. 27, is **GRANTED**. The Clerk shall enter a JUDGMENT and close this case.

Dated this 17th day of March, 2021.

BENJAMIN H. SETTLE
United States District Judge